IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GREGORY WILLIAMS,       ) | |
|       ) | |
|     Plaintiff,       ) | |
|       ) | |
| vs.       ) | Case No. 3:18-CV-87-MAB |
|       ) | |
| WEXFORD HEALTH SOURCES, INC.,   ) | |
| JOHN BALDWIN, PENNY GEORGE,   ) | |
| STEVEN ALDRIDGE,       ) | |
| DEBBIE KNAUER,       ) | |
| JEANNE CAMPANELLA,       ) | |
| MATTHEW SWALLS, DYLAN LUCE,   ) | |
| DAVID MEIER, and DIANNA INMAN,  ) | |
|       ) | |
|     Defendants.       ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment filed by Defendants Wexford Health Sources, Inc. and Steven Aldridge ("the Wexford Defendants") and Defendants John Baldwin, Penny George, Debbie Knauer, Jeanne Campanella, Matthew Swalls, Dylan Luce, David Meier, and Dianna Inman ("the IDOC Defendants") (Docs. 88, 96). For the reasons discussed below, both motions are granted in part and denied in part.

## BACKGROUND

Plaintiff Gregory Williams filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging that various prison officials and medical providers at Vienna Correctional Center were deliberately indifferent to his serious dental needs in violation of the Eighth Amendment

(Doc. 1, Doc. 7). Specifically, he alleges that he was on the waiting list for dentures for over two years, during which time he was in pain and his upper gums were irritated, swollen, and/or bleeding. When he was finally called in to begin the denture fabrication process, the dentist refused to do so because Plaintiff did not have sufficient funds in his account to cover a $154.70 lab fee. Following a threshold review of the complaint under 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following claims:

> **Count 1:** Defendants Dr. Steven Aldridge, Dylan Luce, Debbie Knauer, Jeanne Campanella, Penny George, Dianna Inman, David Meier, Matthew Swalls and John Baldwin were deliberately indifferent to Plaintiff's serious medical need for dentures in violation of the Eighth Amendment when Aldridge refused to order new dentures or treat Plaintiff's gum issues resulting from the lack of dentures, and Luce, Knauer, Campanella, George, Inman, Meier, Swalls, and Baldwin failed to intervene.

> **Count 2:** John Baldwin and Wexford Health Sources, Inc. promulgated an unconstitutional policy in violation of the Eighth Amendment by requiring inmates to pay for replacement dentures, even when they are indigent, or go without pursuant to Administrative Directive 04.03.102(6)(b).

(Doc. 7).

The Wexford Defendants filed their motion for summary judgment on April 16, 2020 (Doc. 88). Plaintiff filed a response in opposition (Doc. 90), to which Dr. Aldridge and Wexford filed a reply (Doc. 91). The IDOC Defendants filed their motion for summary judgment on July 29, 2020 (Doc. 96). Plaintiff filed a response in opposition (Doc. 98), to which the IDOC Defendants filed a reply (Doc. 102).

<u>FACTS</u>

Wexford Health Sources, Inc. ("Wexford") is a private corporation that contracts with the IDOC to provide medical care to inmates in IDOC custody. Wexford employs

Dr. Steven Aldridge, who has been working as the dentist at Vienna since approximately 2010 (Doc. 89-3, pp. 5–9). He is the only dentist at Vienna and he works "full-time," meaning 40 hours per week (*Id.* at pp. 7, 11).

Plaintiff Gregory Williams has been in an out of IDOC custody since the early 1990s (Doc. 89-1, pp. 23–24, 26, 28). He started wearing a partial upper denture in IDOC custody when he was around 29 years old (Doc. 90, p. 2). It was replaced on two occasions, first by an outside dentist in approximately 2004 and then by an IDOC dentist in 2008 (*Id.*). The 2008 denture replaced all of Plaintiff's top teeth except for one (*Id.*).

Plaintiff's only remaining upper tooth broke and it was removed in 2014 or 2015, while Plaintiff was in county jail (Doc. 89-1, p. 31–32; *see also* Doc. 90, pp. 2–3). However, Plaintiff was still able to wear his upper partial denture even though he no longer had a tooth to anchor it to (*Id.* at pp. 32–33). But then it broke, leaving Plaintiff's partial denture in three pieces (*Id.* at p. 33). Plaintiff had all three pieces when he went to the IDOC receiving facility at Stateville in April 2016, but then two of them went missing (*Id.* at pp. 33–35). When Plaintiff arrived at Vienna in May 2016, he had only one remaining piece of his upper partial denture, which had four teeth on the right side (*Id.* at p. 36).[1] Plaintiff also had teeth on the bottom, including on the right side (*Id.* at pp. 36–37).

Shortly after his arrival at Vienna, Plaintiff submitted an Offender Request to the dentist on May 7, 2016, asking to be seen in regard to his partial denture because he only

---

[1] Plaintiff testified at his deposition "there was like five teeth still on it" (Doc. 89-1, p. 35). However, the documentary evidence in this case, including the Offender Request Plaintiff wrote in May 2016 asking for new dentures and the dental records from May 2016, indicate the denture had four teeth (Doc. 90-4, p. 1; Doc. 89-2, p. 257).

had four teeth left on it and could not "fully chew food" (Doc. 90-4, p. 1). The Request was received by the dental department, (Doc. 89-2, p. 10), and Dr. Aldridge saw Plaintiff for the first time on May 10th (Doc. 89-2, p. 257; Doc. 89-3, pp. 31–37; *see also* Doc. 90-4, p. 1). Dr. Aldridge testified at his deposition that Plaintiff "was wearing what was left of a denture, which wasn't very much" but it was still "somewhat" functional (Doc. 89-3, pp. 33, 78). Dr. Aldridge noted the denture could not be repaired; replacement was the only option (*Id.*; Doc. 89-1, p. 53). Because Plaintiff met the criteria for a full upper denture— meaning, he had no upper teeth and he wanted a new denture—Dr. Aldridge added him to the waiting list and told Plaintiff that he would be responsible for paying a lab fee of $154.70 (Doc. 89-3, pp. 31–32, 35–36, 63).

The waiting list is first come-first serve; new patients are added to the end of the list and the dental clinic works their way down the list (Doc. 89-3, pp. 26, 27). They generally do not skip ahead unless the medical doctor has referred the patient due to some sort of medical issue, for example, the inmate has been rapidly losing weight because they cannot eat without a denture (*Id.*). Dr. Aldridge estimated that patients are usually on the wait list for at least six months until they are called in to begin the denture fabrication process but did not think a patient would ever have to wait as long as two years (*Id.* at p. 34). The fabrication process is a five to six step process that takes approximately five to six months to complete (Doc. 90, p. 5).

Dr. Aldridge testified that he followed the IDOC's Administrative Directive

04.03.102 in determining that Plaintiff had to pay the lab fee (Doc. 89-3, pp. 28–29, 36).[2]

The Directive provides:

> Offenders who have lost or broken a dental prosthetic through negligence shall be required to pay the dental laboratory fee for replacement. The offender shall be required to sign a Request for Payment, DC 828, authorizing the deduction of the payment from present or future funds in his or her trust fund account. The time frame for replacement shall be according to priority and availability as determined by the dentist.

(Doc. 1-1, p. 3). According to Dr. Aldridge, that means the IDOC will pay for the dentures if the IDOC removed the inmate's teeth or otherwise "caused" the inmate to need dentures (Doc. 89-3, pp. 28–29, 64). But if the inmate came to Vienna with a denture from an outside dentist or had a prior denture issued by the IDOC, and it got lost or broken while at Vienna, then the inmate has to pay the lab fee (*Id.*).[3] Dr. Aldridge determined that because Plaintiff had the upper denture prior to his arrival at Vienna, he had to pay to replace it (*Id.* at p. 36). Dr. Aldridge testified that he did not have the authority to override the Directive or waive the lab fee (*Id.* at pp. 69–70, 81).

It is undisputed that Plaintiff did not have to pay the lab fee at the time he was put on the wait list (Doc. 89-1, p. 53; Doc. 89-3, pp. 26, 67–68, 70–71, 81). Rather, according to Plaintiff, Dr. Aldridge told him that he had to pay when his turn came and he was called

---

[2] Neither party provided a copy of Administrative Directive 04.03.102 that the Court can find (*see* Docs. 88, 89, 90, 91, 96, 97, 98, 102). However, Plaintiff attached a portion of it to his complaint, (Doc. 1-1, p. 3), and the IDOC Defendants quoted a relevant portion in their reply brief (Doc. 102, p. 15), which match. The Court will thus consider these materials for summary judgment purposes.

[3] The Court notes that Dr. Aldridge's interpretation is not entirely consistent with the language of the Directive, which states "Offenders who have lost or broken a dental prosthetic *through negligence* shall be required to pay the dental laboratory fee for replacement." (Doc. 1-1, p. 3; Doc. 102, p. 15) (emphasis added). It does not say that offenders are required to pay to replace a dental prosthetic that is broken due to age and normal wear and tear.

in to begin the denture-making process (Doc. 89-1, p. 53). Plaintiff testified that he was told "services would be . . . provided only if I had the funds in my account" (*Id*.). Dr. Aldridge's testimony was the same. He agreed that "the lab fee would be due whenever [the inmate's] turn came up" (Doc. 89-3, p. 30). He further testified that sometimes they even call the inmate in a month or so ahead of time "to let them know . . . now's when you need to get your money in order, because we're getting close now" (*Id*. at pp. 68–69). And when asked, "[i]f [Plaintiff] came up on the list where it was his turn for an upper denture and he didn't have the $154.70, would he have gotten his dentures?", and Dr. Aldridge responded, "Right then? No. We would give him the opportunity [to] get money sent in or however he wanted to do it." (*Id*. at pp. 59–60). In other words, Plaintiff was required to pay the lab fee in full before Dr. Aldridge would begin fitting him for a new denture.

This, however, conflicts with the express language of Administrative Directive 04.03.102(6)(b), which states, "The offender shall be required to sign a Request for Payment, DC 828, authorizing the deduction of the payment from present *or future funds* in his or her trust fund account." (Doc. 1-1, p. 3) (emphasis added). The Directive does *not* say that inmates have to pay the lab fee in full up front in order to receive dentures. Rather, it says that a prisoner only has to sign the voucher agreeing to pay the lab fee either from present funds (if they currently have the money) or from future funds (if they do not currently have the money).

On September 1, 2016, approximately four months after his initial appointment with Dr. Aldridge, Plaintiff filed a grievance (Doc. 90-5, pp. 1–3, 9–11). He indicated that

the dentist told him his upper denture could not be repaired and it would cost $154.70 to get a replacement but he could not afford that. Counselor Dianna Inman responded and recapped that the denture could not be repaired and it would cost $154.70 to replace it. Grievance officer David Meier's response said the same thing and reiterated that Plaintiff was responsible for the cost to replace the upper denture. Warden Jeanne Campanella, through her designee, Assistant Warden Dylan Luce, denied the grievance, but told Plaintiff that although he was responsible for the cost of a replacement, "funds can be restricted for payment," meaning Plaintiff would be charged now but pay later whenever he had the money in his account, which is consistent with Administrative Directive 04.03.102. Plaintiff appealed this grievance to the Administrative Review Board, where Debbie Knauer deemed it untimely (Doc. 1-1, p. 57).

Plaintiff went back to the dentist on October 19, 2016 after putting in a request to be seen (Doc. 89-2, p. 257; *see also* Doc. 89-3, pp. 39–43, 71–72). At the appointment, Plaintiff complained of "bleeding gums" (Doc. 89-3, pp. 39–40). Dr. Aldridge examined Plaintiff's gums but found no redness, swelling, irritation, or abrasions (*Id.* at pp. 71–72). Dr. Aldridge testified that he "didn't see any - - anything unusual that would have led me to - - to do some type of treatment" for the gums (*Id.* at p. 66). He did, however, see calculus build up (which is also referred to as tartar or plaque) and bone loss on Plaintiff's bottom teeth, so he put Plaintiff on the prophylaxis list to be scheduled for teeth cleaning (*Id.* at p. 40). Sometime after this appointment, Plaintiff's one remaining piece of denture broke again (Doc. 89-1, pp. 38–39, 58). At that point, it no longer functioned at all and Plaintiff was left with no upper teeth (*Id.*).

In late December 2016, Plaintiff complained to a mental health clinician "of sore gums due to no upper dentures" (Doc. 90-3, pp. 1–2). He told the clinician that "he deserves to have free dentures" and complained he was not being given "adequate pain medication" (*Id.*). Two days later, Plaintiff sent an Offender Request to the dentist "Re: Soreness in roof of upper gums" (Doc. 90-4, p. 2; *see also* Doc. 89-2, p. 9). He wrote that his upper gums "are still swollen and I['m] struggling to eat meals as a result of it. I may need some oral gel to numb, so I can eat" (Doc. 90-4, p. 2). The Request was received by the dental department, (Doc. 89-2, p. 9), and Dr. Aldridge saw Plaintiff on December 28th (*Id.* at p. 257). Plaintiff testified at his deposition that he had "some extreme pain going on" and he asked Dr. Aldridge for a soft food permit and pain medication, all to no avail (Doc. 89-1, pp. 58–62). He said Dr. Aldridge "downplayed the situation as if I had no pain" and said "there was nothing wrong with my mouth" (*Id.*). Dr. Aldridge wrote in the medical notes that Plaintiff's gums were normal color and there was no swelling, and he prescribed no treatment (Doc. 89-2, p. 257; Doc. 89-3, pp. 43–44, 66, 72–73).

The day after his appointment with Dr. Aldridge, a mental health clinician documented that Plaintiff was having "persevering" thoughts about his "dental health" (Doc. 90-3, p. 4). Later that same day, Plaintiff was seen at the nurse sick call for what was documented as "irritated gums" (Doc. 89-2, p. 77). Plaintiff recalled at his deposition that the pain "was just excruciating" and this "was one of them time, like, suicidal times" (Doc. 89-1, p. 66). He told the nurse that his gums had gotten a little better because he stopped eating for a day (Doc. 89-2, p. 77). The nurse documented that Plaintiff's gums appeared slightly irritated and gave him Oragel and ibuprofen (*Id*)**.** Plaintiff also filed

another grievance that day regarding "medical staff misconduct" (Doc. 90-5, pp. 4–5). He said he went to the dentist and "again brought to his attention the extremist of pain to upper gums" (*Id.*). He asserted that he had a serious need for an upper denture and he had repeatedly complained about the pain he endured without one (*Id.*). He claimed that the dentist refused to provide him with one because he could not afford the lab fee (*Id.*). He asked that a denture be given to him even though he cannot pay for it (*Id.*). Counselor Inman responded and reiterated that Plaintiff had to pay for a replacement denture (*Id.* at p. 4). She further noted that Plaintiff was seen in December 2016 and January 2017 complaining of sore gums but both times his gum tissue was normal (*Id.*). Grievance Officer Meier then received the grievance and sought input from Dr. Aldridge, who said that Plaintiff was responsible for the lab fee of $154.70 (*see* Doc. 90-5, pp. 6, 7–8). Warden Matthew Swalls denied the grievance (*Id.*).[4] Plaintiff appealed this grievance to the Administrative Review Board, where Debbie Knauer recommended denying it because it was appropriately addressed by the facility (*Id.* at p. 12). Director John Baldwin, through his designee Leslie McCarty, concurred with the recommendation and denied the appeal (*Id.*; Doc. 98-10).

On January 16, 2017, Plaintiff sent an Offender Request to the dentist saying, "the same spot on wisdom tooth has a bump on it and its sore—where I said it was an ab[s]cess, and front gums are sore and very irritated" (Doc. 90-4, p. 3). At his deposition,

---

[4] Matthew Swalls became Warden in January 2017 after Warden Jeanne Campanella left (Doc. 98-5; Doc. 98-9). Swalls served as Acting Warden/Warden until his retirement in January 2020 (Doc. 98-9).

he described it as a "little white dot with a lot of swelling behind it" that was "so painful" (Doc. 89-1, p. 73). The Request was received by the dental department, (Doc. 89-2, p. 11), and Dr. Aldridge saw Plaintiff on January 18th, where Plaintiff complained of "irritated gums" (*Id.* at p. 257). Dr. Aldridge testified that when he examined Plaintiff's gums, there was no sign of irritation; they were normal in color and there was no swelling (Doc. 89-3, pp. 45–46, 73–74). Dr. Aldridge determined that Plaintiff's gums were within normal limits and no treatment was necessary (*Id.* at pp. 46, 66).

A week later, Plaintiff reported to a mental health clinician that he "still [had] mouth pain from no dentures" and spent the session complaining about the medical care he had received while incarcerated (Doc. 90-3, p. 5). On January 30th, he told a different mental health clinician that he was "having chronic pain from an issue in my gums" (*Id.* at p. 6). On January 31st, Plaintiff filed an emergency grievance about his need for dentures (Doc. 1-1, p. 66). He wrote that he had suffered for eight months and the dentist told him on a weekly basis there was nothing he could do about Plaintiff's pain and discomfort (*Id.*). Plaintiff said he had sores on his gums, his gums were infected, and his face was now distorted and disfigured from going so long without dentures (*Id.*) He wrote that he was told on several visits he had to pay $154.70 for dentures or nothing would be done—"No money – no teeth" (*Id.*). Defendant Swalls, who was now the warden, determined the grievance was not an emergency (*Id.*). It then went to Counselor Inman, who responded by telling Plaintiff this issue had already been addressed and he could not file duplicate grievances for the same issue (Doc. 1-1, p. 66). It does not appear this grievance went any further (*see id.*).

Plaintiff was brought in to have his bottom teeth cleaned on February 2, 2017 (Doc. 89-2, p. 257; Doc. 89-3, pp. 46–49). No treatment was provided for his upper gums (*see* Doc. 89-2, p. 257). A couple days later, Plaintiff sent Offender Requests to Warden Swalls, Assistant Warden Luce, and Penny George, who was the Health Care Unit Administrator (Doc. 90-4, pp. 6–11). The Requests are not identical, but they all contain the same general information (*see id.*). Plaintiff indicated that his upper gums are sore, irritated, swollen, and potentially infected due to eating without upper dentures (*Id.*). He stated that he had complained to the dentist but the dentist took no action (*Id.*). He further stated that he is being denied dentures until he can pay for them (*Id.*). It is unclear whether these Requests were received by Swalls, Luce, and George (*see* Doc. 97, Doc. 98), but Plaintiff's handwritten notes on his copies of the Requests indicate that he did not receive a response to them (*see* Doc. 90-4, pp. 6–11).

On March 1, 2017, Williams told a mental health clinician, "I am also having pain in my mouth. I went on a hunger strike before, I could do it again, I will get dentures before I leave here" (Doc. 90-3, p. 7). On May 16, 2017, Plaintiff sent additional Offender Requests to the dentist, Warden Swalls, Assistant Warden Luce, and Penny George indicating that he had an abscess on his gums that was painful to the touch, his left upper gums were irritated and noticeably swollen, and he could not eat on the left side (Doc. 90-4, pp. 15–30). The Request sent to the dentist was not marked "received" nor was it found in Plaintiff's medical records like the previous requests (Doc. 91, p. 3). It is unclear whether Swalls, Luce, and George received these Requests (*see* Doc. 97, Doc. 98), but Plaintiff's handwritten notes on his copies of the Requests indicate that he did not receive

a response to them (*see* Doc. 90-4, pp. 15–30).

On June 14, 2017, Plaintiff "complain[ed] animatedly" to a mental health clinician "about his denture issues and not having correct dental care." (Doc. 90-3, p. 10). He told the clinician he was "indigent and cannot pay" and "it keeps me depressed" (*Id.*). The clinician noted that Plaintiff was "fatalistic and angry concerning his health care" (*Id.*).

Plaintiff went back to the dentist on August 1, 2017 to have his bottom teeth cleaned again (Doc. 89-2, p. 257; Doc. 89-3, pp. 48–49). No treatment was provided for his upper gums (*see* Doc. 89-2, p. 257). On August 14, 2017, he said to a mental health clinician, "I am ok, but my gums have been inflamed but other than that I am ok" (Doc. 90-3, p. 11). On September 6, 2017, Plaintiff sent Offender Requests to Warden Swalls, Assistant Warden Luce, and Penny George requesting "Adequate Medical [and] Dental Service" (Doc. 98-7, p. 2; *see also* Doc. 1-1, pp. 71–78). The Requests themselves simply indicate that Plaintiff previously wrote to the addressees but did not receive a response and he is hoping to receive a response "on this letter of importance" (Doc. 1-1, pp. 71, 73, 75). Attached to each Request was a one-page letter in which Plaintiff complained in pertinent part that dental treatment is being denied or delayed "due to non-medical reasons, to compel funds" but he is "indigent" (*Id.* at pp. 72, 74, 76, 77). Assistant Warden Luce asked Penny George to respond to the Requests and she did on September 12th (*Id.* at p. 78). George wrote:

> Offender has been seen numerous times by HCU Staff. Dental 6 times. Nurse sick call 18 times. MD sick call 13 times. Eye Dr. 4 times. Lab 3 times and refused sick call 10 times. Treatment has been provided at all visits and co-pays have been approp. For all requested services. You are also followed by Mental Health staff and Gen Med Clinic every (6) months. You have also

been seen @ Marion Eye Clinic.

(*Id.*).

Five months later, on February 15, 2018, Williams told a mental health clinician, "I am ok, same 'ole problems, gum pain . . ." (Doc. 90-3, p. 12). On April 16, 2018, Dr. Aldridge saw Plaintiff for his biannual exam (Doc. 89-2, p. 257; Doc. 89-3, pp. 49–50). Dr. Aldridge noted that Plaintiff had no teeth on top, no cavities were detected, his gums were normal color, and there was no swelling. The notes say nothing about Plaintiff's denture and no treatment was provided for his upper gums (*see* Doc. 89-2, p. 257).

Then on August 3, 2018—over two years after Plaintiff was put on the wait list for dentures—he was finally called in but Dr. Aldridge did not begin fitting him for a new denture (Doc. 89-2, p. 257). Rather, Dr. Aldridge noted in the medical records that Plaintiff said "he will never have money to pay lab fees" and he advised Plaintiff to follow up if anything changed (*Id.*).

Plaintiff was released from incarceration on February 21, 2019 (Doc. 90, p. 8). Plaintiff had to wait two months for approval from his insurance company before seeing a dentist outside of prison (Doc. 89-1, pp. 15–21). Plaintiff's outside dentist (Dr. Shahin) performed other dental care before addressing his request for dentures (*Id.*; *see also* Doc. 89-5). It appears that Plaintiff began the denture fitting process in late July 2019 and received his full upper denture about a month later (*see* Doc. 89-5).

## DISCUSSION

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R.

CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a plaintiff must demonstrate that they suffered from an "objectively, sufficiently serious" medical condition and that the defendant acted with a "sufficiently culpable state of mind." *Id.*

## I.   SERIOUS MEDICAL NEED

The Wexford Defendants contend that they are entitled to summary judgment because Plaintiff was not suffering from a serious medical need (Doc. 89). The IDOC Defendants, however, do not contest that Plaintiff's need for dentures and gum issues constituted a serious medical need (*see* Doc. 97).

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Importantly, "[a] medical condition need not be life-threatening to be serious." *Id.* It can be a condition that "significantly affects an individual's daily activities" or a condition that would result in further significant injury or chronic and substantial pain if left untreated. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

In *Wynn v. Southward*, the Seventh Circuit found the plaintiff had demonstrated "a serious medical need for his dentures" where he alleged "that he has been unable to chew his food without his dentures, significantly impeding his ability to eat, and that he has suffered bleeding, headaches, and 'disfigurement.'" 251 F.3d 588, 593 (7th Cir. 2001). *See also Young v. Kazmerski*, 266 Fed. Appx. 191, 193 (3d Cir. 2008) (holding inmate had a serious medical need for dentures where he complained that he was in pain and could not eat or sleep properly because his bottom teeth were cutting into his top gums); *Farrow v. West*, 320 F.3d 1235, 1244 (11th Cir. 2003) (holding inmate had a serious medical need for dentures where on repeated occasions, the inmate had pain and swollen and bleeding gums, he had to modify his diet to eat only soft food, and the dentist noted that he had lost a significant amount of weight and needed to get a physical examination).

Here, the record demonstrates that Plaintiff repeatedly and frequently complained in grievances, in request slips, and directly to medical staff and mental health providers that it was difficult for him to eat without upper dentures, he was in pain, and his upper gums were irritated, swollen, and/or bleeding (Doc 89-2, pp. 9, 10, 11, 12, 77, 257; Doc.

90-4; Doc. 90-5, pp. 1–2, 4–5, 10–11). Defendants Aldridge and Wexford nevertheless contend that Plaintiff's lack of a full upper denture was not a serious medical need because he had no difficulty eating as demonstrated by his testimony that he ate "big meals" at Vienna and he purchased foods from the commissary like chips, meat, pickles, candy bars, and cookies (Doc. 89, pp. 10–11).[5] Defendants also point out that Plaintiff gained weight while at Vienna (*Id.* at p. 11). And there were also times where Plaintiff had enough money in his account to cover the lab fee, but he spent it elsewhere (*Id.* at p. 12). However, Defendants' arguments are unavailing.

First, with respect to Plaintiff's commissary purchases, he testified that not everything he bought at the commissary was for him; he would buy foods to trade with other inmates (Doc. 89-1, pp. 45–47). He explained that each item at the commissary had a purchase limit, meaning an inmate could not buy more than the set limit for each item. So, once Plaintiff reached his limit on the foods he wanted, he would buy things to trade with other inmates to get more of the items he wanted (*Id.*) ("So I would buy what they want and they would give me what I want. So they'd get me more food to eat outside, 'cause I'm limited up there.").

As for Plaintiff's weight, Defendants point out that "[o]n May 9, 2016, Plaintiff weighed 178 pounds and on June 22, 2018, [he] weighed 190 pounds," (Doc. 89, p. 3), and they draw the conclusion that Plaintiff "gained weight during the time he did not have

---

[5] Defendants' Exhibit D is supposed to contain Plaintiff's commissary records and is apparently supposed to be fifteen pages long (*see* Doc. 89, ¶24). However, the exhibit as submitted contains only eight pages, including only one page of Plaintiff's commissary purchases in March 2018 (Doc. 89-4, p. 8).

upper dentures," which they contend shows that his lack of dentures did not impair his ability to eat and was therefore not a serious medical need (*Id.* at p. 11). But the Court has reviewed the full medical record and does not believe it is as simple as Defendants try to make it. They cherry-picked the facts that enabled them to make the conclusory assertion that Plaintiff gained weight during his time at Vienna and failed to consider the big picture. The records show that Plaintiff's weight was almost constantly in flux during the two-plus years he was at Vienna, going as low as 174 and as high as 200 (*see* Doc. 89-2). And there were times where Plaintiff's weight fluctuated *wildly;* he would lose or gain a striking amount of weight in a very short time. For example, in late 2016, he lost 11 pounds in 11 days (Doc. 89-2, pp. 64, 67). In mid-2017, he lost 13 pounds in 9 days (*Id.* at pp. 88, 90). Then he gained 26 pounds in 14 days (*Id.* at pp. 96, 100), and another time he gained 15 pounds in 14 days (*Id.* at pp. 19, 125). When all of the facts are considered, it is clear that the story is not as cut-and-dry as saying that Plaintiff's start and end weight show he gained weight at Vienna so he must not have had any problems eating without an upper denture. It is possible that Plaintiff's medical and mental health conditions, or the variety of medications he took for those conditions, contributed to his fluctuating weight. In fact, he testified at his deposition that he "put on some weight at one point . . . I think because of the medicine I was taking" (Doc. 90-2, p. 77).

Finally, Defendants claim there were "portions of time [where] Plaintiff did have the funds to pay this fee . . . but he chose to spend them elsewhere," which "shows that Plaintiff did not believe that he really needed the dentures, but he simply wanted them for free" (Doc. 89, p. 12). However, they did not submit evidence sufficient to support this

assertion. As mentioned in a previous footnote, Plaintiff's commissary records were not submitted to the Court. Furthermore, there was only one time that Plaintiff's balance exceeded the amount of the lab fee, which is when he received a $300 settlement check in March 2018 (Doc. 89-4, p. 5). But that entire amount was consumed seven days after Plaintiff received the money by a string of eighteen "Disbursements" for "Library," "Court Ordered Fees," and "Legal Postage" (*see id.*). This suggests to the Court these deductions were for restrictions on Plaintiff's account, meaning debts that he owed, and they were automatic and not something he could control. *See, e.g.,* 28 U.S.C. § 1915(b)(2) (authorizing payment of court fees anytime the inmate's trust fund account exceeds $10). In other words, he could not have saved the money for dentures even if he wanted to. But Defendants did not provide any explanation of the entries on Plaintiff's trust fund account statement, nor did they ask him about it during his deposition (*see* Docs, 89, 89-1, 91). Without knowing exactly what Plaintiff bought at the commissary or the details of his expenditures, the Court cannot possibly conclude that Plaintiff squandered his money or even that he had a realistic opportunity to save his money.

At best, Defendants' arguments perhaps cast some degree of doubt on Plaintiff's version of the story, but they are not strong enough to completely negate it. It takes little effort to imagine that some people without any upper teeth might find the constant, direct contact between their bare upper gums and their lower teeth painful, *especially* when trying to eat. Viewing the record in the light most favorable to Plaintiff, the Court concludes that the evidence concerning his dental problems presents a genuine issue of material fact that must be resolved by a jury as to whether he had a serious medical need.

## II.    DELIBERATE INDIFFERENCE RE: COUNT 1

To recap, in Count 1, Plaintiff alleges that Dr. Aldridge was deliberately indifferent when he refused to order new dentures for Plaintiff or treat his gum issues resulting from the lack of dentures, and a number of non-medical officials were likewise deliberately indifferent when they failed to intervene.

### A.  Dr. Aldridge

In the complaint, Plaintiff alleged that Dr. Aldridge was deliberately indifferent when he refused to order Plaintiff a new upper denture and to treat his gum issues resulting from the lack of dentures (Doc. 7).

A medical professional may be held to have displayed deliberate indifference if the treatment decision was "blatantly inappropriate" even to a layperson, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious."), or there is evidence that the treatment decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties*, 836 F.3d at 729; *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'") (citation omitted).

Here, there is no evidence from which a jury could find that Dr. Aldridge's decision in May 2016 not to replace Plaintiff's upper denture immediately reflected

deliberate indifference. Dr. Aldridge's unrebutted testimony was that, in his professional judgment, replacing the denture was not an emergency medical need. But then there was a delay of approximately twenty-seven months between the time that Plaintiff was put on the waiting list for dentures in May 2016 and when he was called up in August 2018 to begin the denture fabrication process. During this time, Plaintiff repeatedly complained about severe pain, bleeding gums, and difficulty eating. But Dr. Aldridge did not provide Plaintiff with any type of palliative care, such as pain reliever, numbing gel, a permit for ice, or a soft food diet. A delay in providing treatment that serves no penological interest and unnecessarily prolongs an inmate's suffering can support a claim of deliberate indifference. *Petties*, 836 F.3d at 730. Twenty-seven months seems like an inordinately long time to wait for the denture-making process to begin. Dr. Aldridge himself testified that he did not think a prisoner would ever have to spend that long on the waiting list for dentures (*see* Doc. 89-3, p. 34). And at this juncture, Defendants have not offered any explanation whatsoever for the delay (*see* Docs. 89, 91). They also did not provide any evidence suggesting that they delay was unavoidable or due to administrative reasons outside of Dr. Aldridge's control (*see* Docs. 89, 91). *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (explaining that deliberate indifference can result only when delay in care was in control of defendant). When viewing the evidence in a light most favorable to Plaintiff, a jury could conclude that Dr. Aldridge was deliberately indifferent to Plaintiff's serious medical needs given the nature of his ongoing gum issues, the sheer length of the delay involved, and the lack of any explanation for it.

Furthermore, the evidence shows that once Plaintiff's turn on the waiting list was up and he was called in, Dr. Aldridge refused to move forward with fitting Plaintiff for a denture because Plaintiff did not have enough money in his account to cover the lab fee. A reasonable jury could find that this constitutes deliberate indifference. *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997) ("P]rison officials may not 'condition provision of needed medical services on [an] inmate's ability or willingness to pay.'" (quoting *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987))). *See also Cannon v. Mason*, 340 Fed. Appx. 495, 498 (10th Cir. 2009) ("The Eighth Amendment prohibits prison officials from denying an inmate medical treatment due to a lack of funds or conditioning the provision of needed medical services upon an inmate's ability to pay."); *Clark v. Doe*, 202 F.3d 272, 1999 WL 994019, at *2 (7th Cir. 1999) (affirming dismissal of inmate's medical expense claim where hospital billed inmate for $1,700 because prison "fulfilled its Eighth Amendment duty to Clark by seeing that he was immediately taken to the hospital for treatment" and his "medical care was not conditioned on his ability to pay for it."); *Martin v. Debruyn*, 880 F. Supp. 610, 615 (N.D. Ind. 1995) ("A prison official who withholds necessary medical care, for want of payment, from an inmate who could not pay would violate the inmate's constitutional rights if the inmate's medical needs were serious . . . ."), *affirmed* 116 F.3d 1482 (7th Cir. 1997); *Ancata v. Prison Health Servs. Inc.,* 769 F.2d 700, 704 (11th Cir. 1985) ("Delay in medical treatment cannot be justified as a means to coerce payment."); *Gonzalez v. O'Brien*, No. 16 C 50023, 2017 WL 1178602, at *4 (N.D. Ill. Mar. 30, 2017); *Foy v. Bantry Group*, 2016 WL 5107096, at *2 (C.D. Ill. 2016); *Weeks v. Hodges*, 871 F.Supp.2d 811 (N.D. Ind. 2012).

### B.  GRIEVANCE OFFICIALS

For the following Defendants, Plaintiff claims that he complained to them in some form or fashion (*e.g.*, written correspondence, grievance, face-to-face) regarding the purportedly inadequate dental care that he was receiving, but Defendants ignored his complaints and failed to take any corrective action.

When it comes to non-medical officials, the Seventh Circuit has "long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019), *cert. denied,* 140 S. Ct. 50 (2019). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)). However, non-medical officials can be held liable for deliberate indifference if they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Giles*, 914 F.3d at 1050 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). An inmate's correspondence to a prison official may thus establish a basis for personal liability under § 1983 where that correspondence, "in its content and manner of transmission" gave the official sufficient notice that the prisoner's serious medical condition was not being treated by prison medical providers, yet the official took no action to assist in obtaining care for the prisoner. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (citation omitted); *accord Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015).

As for medical administrators like Healthcare Unit Administrator Penny George, who is not directly responsible for providing medical care, she can be held liable as a supervisor if she knows of and facilitates, approves, condones, or turns a blind eye to medical personnel providing inadequate treatment. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

### 1. Counselor Dianna Inman

Dianna Inman was a correctional counselor at Vienna. She responded to all three of Plaintiff's grievances, which were dated September 1, 2016, December 29, 2016, and January 31, 2017. The grievances very clearly stated that Dr. Aldridge was not going to give Plaintiff the full upper denture unless and until Plaintiff paid $154.70. As explained above, conditioning the provision of needed medical services on prepayment cuts against the Eighth Amendment and is in direct contravention of the dictates of Administrative Directive 04.03.102. However, in responding to the grievances, Ms. Inman simply reiterated that Dr. Aldridge said Plaintiff was going to be charged $154.70 for the replacement denture. She said nothing of the fact that Dr. Aldridge told Plaintiff the entire amount had to be paid up front or he would not get dentures.

Counselor Inman argues that she was entitled to defer to the judgment of the health professionals (Doc. 97, pp. 9–10: Doc. 102, p. 13). This true when it comes to matters of patient care that involve the exercise of medical judgment. *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) ("[N]on-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care[.]"). However, the issue the grievance presented was whether Dr. Aldridge was flouting the

IDOC's policy and the Eighth Amendment's requirement that necessary medical care be provided even when the inmate cannot afford to pay for it. In short, no medical judgment was involved. Rather, ensuring that the medical department is adhering to IDOC policies seems to be precisely the type of responsibility that falls squarely on grievance officials. Therefore, Counselor Inman could not simply defer to Dr. Aldridge on the issue. She was obligated to investigate. But it does not appear that she took any action to truly investigate whether Dr. Aldridge was indeed conditioning treatment on Plaintiff's ability to pay for it or to exercise her authority to intervene on Plaintiff's behalf to rectify the situation. And the risk Plaintiff identified in his grievances of being denied dental treatment due to insufficient funds eventually came to pass. A reasonable jury could view Counselor Inman as deliberately indifferent for turning a blind eye to behavior that obviously contravened IDOC's internal policy. To the extent that Counselor Inman is claiming that she is entitled to qualified immunity, her argument is simply too undeveloped to succeed (*see* Doc. 97, p. 16). For these reasons, Counselor Inman is not entitled to summary judgment and the motion is denied as to her.

### 2. Grievance Officer David Meier

Grievance Officer Meier received and responded to Plaintiff's first two grievances. His responses were similar to Counselor Inman's—he simply reiterated that Plaintiff was going to be charged $154.70 for the denture and said nothing about Dr. Aldridge requiring Plaintiff to pay that amount in full up-front in order to begin the denture-making process. For the same reasons explained above with respect to Counselor Inman,

Grievance Officer Meier is not entitled to summary judgment on Plaintiff's claims or to qualified immunity, and the motion is denied as to him.

### 3.   Warden Jeanne Campanella

Jeanne Campanella was the warden who denied Plaintiff's first grievance. It is undisputed, however, that Warden Campanella was not actually personally involved in reviewing and responding to the grievance (Doc. 98-5). Rather, Assistant Warden Luce was designated to do so on Warden Campanella's behalf (Doc. 98-5, Doc. 98-3). The grievance therefore cannot serve as a basis for holding Warden Campanella liable. *Thomas v. Knight*, 196 Fed. Appx. 424, 429 (7th Cir. 2006) (affirming summary judgment in favor of warden where designee reviewed and ruled on grievance, not the warden); *Ruiz v. Williams*, No. 14-CV-02750, 2018 WL 1469044, at *20 (N.D. Ill. Mar. 26, 2018) (same); *Stallings v. Hardy*, 2013 WL 5781805, at *9 (N.D. Ill. Oct. 25, 2013) (same); *Kelly v. Ghosh*, 2013 WL 773012, at *9 (N.D. Ill. Feb. 27, 2013) (same).

Plaintiff tries to argue that he made Warden Campanella aware of his complaints in ways besides the grievance process (Doc. 98, p. 12). However, he admitted at his deposition that he did not think she received any of his written correspondence (Doc. 89-1, p. 125). And while he also said he "briefly" talked to Warden Campanella in person numerous times when she did rounds through the galleries at Vienna, he did not provide any concrete details about what exactly he told the Warden or how the Warden responded (*see id* at pp. 120–125). His vague testimony is simply not enough to establish that Warden Campanella was personally involved to the point that her own conduct violated his constitutional rights; that is, she was aware of enough facts that she knew

that Plaintiff faced a substantial risk of serious harm to his health or that her response was plainly inappropriate. *Est. of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017); *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016). Rather, the evidence shows, at best, that the Warden brushed off his complaints, leaving them to be handled through the proper channels (*i.e.*, Offender Request slips and/or grievances), which is not sufficient to hold the Warden liable. *Marberry*, 847 F.3d at 429.

Consequently, Warden Campanella is entitled to summary judgment on Plaintiff's claims and the motion is granted as to her.

### 4.  Warden Matthew Swalls

Matthew Swalls is the warden who responded to Plaintiff's second grievance. But like Warden Campanella, Swalls was not actually personally involved in reviewing and responding to the grievance (Doc. 98-9). Rather, Assistant Warden Luce was designated to do so on Warden Campanella's behalf (Doc. 98-swalls, Doc. 98-3). The second grievance therefore cannot serve as a basis for holding Warden Swalls liable.

Plaintiff submitted a third grievance, an emergency grievance, in January 2017. It is undisputed that Warden Swalls became aware of Plaintiff's dental condition by virtue of this emergency grievance (Doc. 102, p. 11). He deemed it a non-emergency and told Plaintiff to submit it through the regular grievance process (Doc. 102, p. 11). Plaintiff did not pursue it beyond his counselor and so it never made it back to Warden Swalls. Plaintiff contends that Warden Swalls is liable because he knew of Plaintiff's complaints of sore and swollen upper gums yet took no action (Doc. 98, pp. 8, 12). But that is not correct. One of Swalls' duties as warden was to determine whether grievances filed on

an emergency basis are true emergencies. In this instance, Swalls determined that Plaintiff's grievance was not. Determining a grievance is not an emergency "no more manifests 'deliberate indifference' to the underlying problem than does a judge's decision dismissing a § 1983 suit as barred by the statute of limitations." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Swalls cannot be held liable for carrying out his job exactly as he was supposed to. *Id.*

For these reasons, Warden Swalls is entitled to summary judgment on Plaintiff's claims and the motion is granted as to him.

### 5. Assistant Warden Dylan Luce

It is undisputed that Luce responded to Plaintiff's first and second grievances on behalf of Warden Campanella and Warden Swalls (Doc. 102, p. 6). In his first response, Luce reiterated that Plaintiff had to pay the cost of the replacement dentures but indicated that "funds could be restricted for payment" (Doc. 90-5, p. 3). However, like the counselor and the grievance officer, there is no indication that Luce made any effort to speak to Dr. Aldridge to ensure that he was, in fact, following the policy and allowing inmates to agree to restrict their future funds for payment. Nor is there any indication Luce made any effort to determine whether Dr. Aldridge was conditioning receipt of dentures on an inmate's ability to pay for them, in violation of Administrative Directive 04.03.102 and the Eighth Amendment. For the same reasons explained above with respect to Counselor Inman, Assistant Warden Luce is not entitled to summary judgment on Plaintiff's claims or to qualified immunity, and the motion is denied as to him.

### 6. Debbie Knauer

Debbie Knauer is a member of the Administrative Review Board. She received Plaintiff's appeal of his first grievance and determined it was untimely. She also received his appeal of his second grievance and responded to it on the merits. In doing so, she reviewed the grievance itself as well as Grievance Officer Meier's response. She determined it "sufficiently responsive," despite the fact it did not address Plaintiff's complaint that Dr. Aldridge was flouting Administrative Directive 04.03.102 and the Eighth Amendment by requiring Plaintiff to pay the lab fee in full in order to start the denture-making process (Doc. 98-4, p. 3), For the same reasons explained above with respect to Counselor Inman, Ms. Knauer is not entitled to summary judgment on Plaintiff's claims or to qualified immunity, and the motion is denied as to her.

### 7. John Baldwin

John Baldwin, the former IDOC Director, did not personally review any of Plaintiff's appeals of his grievances to the Administrative Review Board. Rather, his designee reviewed the appeals and responded to them on his behalf. Therefore, he cannot be held liable based on Plaintiff's grievances. And Baldwin also cannot be held liable solely because he was in charge. *E.g., Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 507–08 (7th Cir. 2017) ("[T]here is no vicarious liability in a suit under section 1983."); *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) ("[T]here is no theory of *respondeat superior* for constitutional torts.") (citation omitted). Consequently, there is no basis for holding Director Baldwin liable  for deliberate indifference under §  1983, and  he  is  entitled to summary judgment.

### 8. Penny George

Penny George is the Health Care Unit administrator. It is undisputed that Plaintiff sent an Offender Request to Ms. George on September 6, 2017. Ms. George claims that Plaintiff did not "specify his concerns about his dentures or gums" in the Request (Doc. 97, p. 4). She also claims that she responded "to Plaintiff's medical and dental treatment concerns" (Doc. 97, p. 11). Neither is true. The Request slip indicated that Plaintiff was requesting "Adequate Medical [and] *Dental* Service," and the attached one-page letter indicated that dental treatment was being delayed or denied in order to "compel funds" (Doc. 1-1, pp. 71–77) (emphasis added). Ms. George's response states only that Plaintiff has been seen by dental six times (*Id.* at p. 78). A reasonable jury could conclude that perhaps Ms. George did not see the letter attached to the Requests. But a reasonable jury could also conclude that Ms. George exhibited deliberate indifference when she ignored Plaintiff's complaint that Dr. Aldridge was withholding treatment because Plaintiff did not have the money to pay the lab fee and also ignored that Plaintiff had been on the waiting list for 16 months. Consequently, summary judgment is not appropriate. Like the other Defendants, to the extent she is claiming that she is entitled to qualified immunity, her argument is simply too undeveloped to succeed (*see* Doc. 97, p. 16). The motion is denied as to Penny George.

To the extent Defendants made other arguments with regard to Count 1 that were not explicitly addressed in this Order, the Court reviewed those arguments and determined they were without merit and did not warrant any discussion.

III.   **DELIBERATE INDIFFERENCE RE: COUNT 2**

In Count 2, Plaintiff alleges that John Baldwin and Wexford Health Sources, Inc. promulgated Administrative Directive 04.03.102, which he claims is unconstitutional because it requires inmates to pay for replacement dentures, even when they are indigent, or to go without.

A.   **WEXFORD HEALTH SOURCES, INC.**

At the time the complaint was screened, the Court noted that it was unclear as to whether the policy at issue was attributable to the IDOC or to Wexford (Doc. 7, p. 6). It is now clear that Administrative Directive 04.03.102 was a policy issued by the IDOC. Plaintiff, however, argues that Wexford can still be on the hook because Dr. Aldridge, who is employed by Wexford, was the one who interpreted and applied the policy (Doc. 90, p. 17). The Court is skeptical of Plaintiff's argument but finds that even if Plaintiff is correct, he still has not adduced sufficient evidence to survive summary judgment.

A private corporation acting under the color of state law, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). Under *Monell*, a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir.2010)). A corporate action can take the form of (1) an express policy adopted and promulgated by the corporation, (2) an informal but widespread and well-settled practice or custom, or (3) a decision by an official of the corporation with final policymaking authority. *Glisson*, 849 F.3d at 379.

Here, Plaintiff says the first and second theories apply (Doc. 90, p. 17). Thus, he must prove that "a violation of his Eighth Amendment rights was caused not only by a Wexford agent or employee but by a corporate policy or widespread practice or custom." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 652 (7th Cir. 2021). With respect to the first theory, the only express written policy that has been identified is the IDOC's Administrative Directive 04.03.102. Even if the Court assumes this policy is attributable to Wexford in some way, Plaintiff has not shown that the policy as written is unconstitutional. It is acceptable to require inmates to pay for a portion of their medical care so long as that care is not withheld pending payment. *Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012) ("The Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care."); *Clark v. Doe*, 202 F.3d 272, 1999 WL 994019, at *2 (7th Cir. 1999) (affirming dismissal of inmate's medical expense claim where inmate received a $1,700 bill from the hospital because prison "fulfilled its Eighth Amendment duty . . . by seeing that he was immediately taken to the hospital for treatment" and his "medical care was not conditioned on his ability to pay for it."); *Martin v. Debruyn*, 880 F. Supp. 610, 615 (N.D. Ind. 1995) (a state can require that an inmate "pay for his medical treatment to the extent he is able to do so, as he would have to do were he not deprived of his liberty. The Eighth Amendment guarantees only that states will not ignore an inmate's serious medical needs; it does not guarantee free medical care."), *affirmed* 116 F.3d 1482 (7th Cir. 1997)). Here, the policy explicitly stated that the provision of dentures was not conditioned upon a prisoner's ability to pay for them. Rather, offenders who must pay a lab fee for

replacement dentures will be "required to sign a Request for Payment, DC 828, authorizing the deduction of the payment from present *or future funds* in his or her trust fund account" (Doc. 1-1, p. 3; Doc. 102, p. 15) (emphasis added). Therefore, the policy itself was not the problem; the problem was that Dr. Aldridge did not follow the policy.

To the extent Plaintiff is claiming Dr. Aldridge's contravention of Administrative Directive 04.03.102 was the result of an informal but widespread and well-settled practice or custom of Wexford, he must show "evidence that there is a true [corporate] policy at issue, not a random event." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) (quoting *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). It cannot just be "the isolated wrongdoing of one or a few rogue employees" *Howell*, 987 F.3d at 654. Here, Plaintiff has only presented evidence of his own experience. He did not present evidence that other inmates were also denied dentures by Dr. Aldridge because they did not have the money in their account to pay the lab fee in full and/or that other dentists employed by Wexford followed the same payment practice as Dr. Aldridge. Plaintiff's experience alone is not enough to survive summary judgment on a widespread practice claim. *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

The motion for summary judgment is granted as to Wexford.

### D.  THE IDOC DIRECTOR

Plaintiff is proceeding against John Baldwin, the former IDOC Director, on the theory that Baldwin had final policy-making authority within IDOC and was personally involved in authorizing and maintaining the unconstitutional policy at issue, which is Administrative Directive 04.03.102 (Doc. 7). As the Court understands it, this claim is

against Baldwin in his official capacity (Doc. 7, p. 7). However, Baldwin left his position as IDOC Director and was replaced by Rob Jeffreys in June 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Rob Jeffreys is automatically substituted in for Baldwin as the Defendant to Count 2.[6]

That being said, Plaintiff has no § 1983 claim against the IDOC Director in his official capacity. That is because the Eleventh Amendment precludes a citizen from suing state officials in their official capacities for money damages. *Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001). And any claim Plaintiff had for injunctive relief is now moot because he was released from prison and obtained new dentures from an outside dentist. *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019) ("[A] court's power to grant injunctive relief only survives if such relief is actually needed."); *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006) ("In an action seeking only injunctive relief . . . once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot."). Consequently, there is nothing left to proceed on. Even if that were not the case, the Director would be entitled to summary judgment because, as explained above, Plaintiff cannot show that the Director was deliberately indifferent in authorizing and maintaining the policy because there is nothing wrong with the policy as written. The

---

[6] The Court cannot simply substitute Jeffreys in for Baldwin on the docket. Baldwin must remain listed on the docket as a Defendant because he is still a Defendant in his individual capacity as to Count 1. Rob Jeffreys must be added to the Docket as a Defendant in his official capacity *only* as to Count 2.

problem was with how Dr. Aldridge applied the policy. Consequently, the IDOC Director is entitled to summary judgment on Count 2.

<u>CONCLUSION</u>

The Clerk of Court is **DIRECTED** to add Rob Jeffreys, in his official capacity, to the docket as a Defendant in this case.

The motion for summary judgment filed by Defendants Wexford Health Sources, Inc. and Steven Aldridge (Doc. 88) is **GRANTED IN PART and DENIED IN PART.** It is denied as to Defendant Aldridge and granted as to Wexford Health Sources, Inc.

The motion for summary judgment filed by Defendants John Baldwin, Penny George, Debbie Knauer, Jeanne Campanella, Matthew Swalls, Dylan Luce, David Meier, and Dianna Inman (Doc. 96) is **GRANTED IN PART and DENIED IN PART.** It is denied as to Defendants George, Knauer, Luce, Meier, and Inman. It is granted as to Defendants Baldwin, Campanella, Swalls.

Count 2 is **DISMISSED with prejudice**. Defendants Wexford Health Sources, Inc., Rob Jeffreys, John Baldwin, Jeanne Campanella, and Matthew Swalls are **DISMISSED with prejudice** and judgment will be entered in their favor at the close of this case.

This matter will proceed to trial on Count 1 against Defendants Dr. Steven Aldridge, Dylan Luce, Debbie Knauer, Penny George, Dianna Inman, and David Meier for money damages *only*.

**IT IS SO ORDERED.**

**DATED: August 23, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**